UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GALINA STILER,

Plaintiff,

v.

AMALGAMATED LIFE INSURANCE
COMPANY, *et al.*

Defendants.

Case No. 24-CV-8962 (KMK)

ORDER & OPINION

Appearances:

Megan Sarah Goddard, Esq.
Clela Alice Errington, Esq.
Goddard Law PLLC
New York, NY
*Counsel for Plaintiff*

Robert Harris Bernstein, Esq.
Michael James Slocum, Esq.
Greenberg Traurig LLP
Florham Park, NJ
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Galina Stiler ("Plaintiff") brings this Action against the Amalgamated Life Insurance

Company ("Amalgamated"), David Sapp, Leslie Bostic, Paul Mallen, Grace Perri, and Terry

Burston, (together, the "Individual Defendants" and together with Amalgamated, "Defendants"),

seeking monetary damages including compensatory damages, mental pain and suffering

damages, statutory and punitive damages, as well as costs and attorneys' fees, for various alleged

violations of state and federal nondiscrimination law. (Am. Compl. ("FAC") ¶¶ 180–259 (Dkt.

No. 22).) Defendants moved to dismiss eight of the claims raised in the Amended Complaint

pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction as to some of the counts, and

pursuant to Rule 12(b)(6) for failure to state a claim as to some of the counts.  (*See* Mot. to Dismiss ("Mot." or the "Motion") (Dkt. No. 27).)  For the reasons that follow, the Motion to Dismiss is granted in part and denied in part.

I.  Background

A.  Factual Background

The facts described herein are taken from Plaintiff's Amended Complaint, (*see* FAC), and taken as true for the purposes of deciding the instant Motion.  *Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 453 (2d Cir. 2024) ("We take these allegations as true at the motion-to-dismiss stage.").

In 2019, Plaintiff, an attorney, was diagnosed with an unspecified "serious, life threatening illness."  (FAC ¶¶ 1, 25.)  The illness, which left her immunocompromised, was worsened by and could recur due to stress, and so her medical team advised her to minimize stress to the extent possible.  (*Id.* ¶¶ 1, 28.)  While being treated for that illness, she received diagnoses of Generalized Anxiety Disorder and Major Depressive Disorder.  (*Id.* ¶¶ 1, 16, 27.)  Plaintiff says that her Major Depressive Disorder limits her sleep, concentration, and enjoyment of everyday life, while her Generalized Anxiety Disorder limits her autonomic nervous system function, respiration, and sleep.  (*Id.* ¶ 27.)  In an effort to reduce her stress, she left a ten-year career at a law firm.  (*Id.* ¶¶ 2, 29.)  She sought a role in-house that would allow her to work regular business hours and alleviate the stress of attempting to reach billable hour targets; such a role, she thought, would be less demanding and stressful than traditional law firm work.  (*Id.* ¶¶ 2, 30.)

In December 2021, Plaintiff joined Amalgamated, an insurance provider headquartered in White Plains, New York, as an in-house attorney.  (*Id.* ¶¶ 3, 17.)  Defendant David Sapp was the

2

Executive Director at Amalgamated; he served as Plaintiff's supervisor and could set the terms and conditions of her employment. (*Id.* ¶¶ 20, 36.) Plaintiff says that, although she had ten years of work experience in 2021 when she was hired, she earned a base salary of $95,000, in contrast with "similarly situated male colleagues," who earned between $150,000 and $175,000. (*Id.* ¶ 33.)

Early in her time at Amalgamated, Plaintiff says that she witnessed the Company's CEO, Defendant Mallen, "openly and aggressively scream at a female secretary." (*Id.* ¶ 38.) While her coworkers acted as though this was a "normal and regular occurrence," Plaintiff says she was "visibly disgusted." (*Id.*) When she shared her concerns with another female employee, who had worked at Amalgamated for many years, the employee told her that she had seen "many women" come out of Defendant Mallen's office crying, but never had seen a man do so, and recounted another incident of a former employee mistreating female employees. (*Id.* ¶¶ 39–40.) The employee said that even when she reported "things to HR, nothing happened." (*Id.* ¶ 40.) Plaintiff also says that she saw Defendant Sapp "berate, ridicule, and talk down to female [p]aralegals" whom he oversaw. (*Id.* ¶¶ 41–42.) Specifically, one paralegal, Sandra Steuben, told Plaintiff that she "often considered quitting" due to Sapp's mistreatment. (*Id.* ¶ 46.) Plaintiff says that she never saw male employees, including support staff, treated this way. (*Id.* ¶¶ 43, 45.)

Despite this environment, Plaintiff performed strongly in her role in 2022. (*Id.* ¶ 4.) Plaintiff says that she received a merit-based raise for her work at Amalgamated in March 2022, (*id.* ¶ 49), and that she made "every effort to avoid direct hostility" from Defendant Sapp, who "had no criticisms of her work," (*id.* ¶ 50), and indeed, "regularly" offered "positive feedback and praise," (*id.* ¶ 51).

In March 2023, Plaintiff learned that Amalgamated had a vacancy for a "Director of Compliance/Assistant Vice President," a role that was more highly compensated than Plaintiff's in-house counsel position. (*Id.* ¶¶ 52–53.) She approached Ellen Dunkin, the General Counsel Senior Vice President at Amalgamated, about the role. (*Id.* ¶ 52.) On information and belief, Plaintiff claims that Dunkin spoke with Defendant Sapp and both said "she was a 'great fit' for the role." (*Id.* ¶ 55.) "[E]ven before [Plaintiff] officially applied and interviewed" Sapp began to give Plaintiff some compliance-related work assignments. (*Id.* ¶ 56.) This same month, Plaintiff received a 3% merit-based raise. (*Id.* ¶ 57.)

Starting in April 2023, she says, Defendant Sapp "aggressively berated her, shouting at her in an unprofessional manner—treatment he never directed towards male colleagues." (*Id.* ¶ 4.) For instance, despite Defendant Sapp signing off on her filing a case-initiating complaint in federal court, he "erupted with anger and berated her for doing so" once the document was filed; he accused her of "threatening" the company's "good reputation with 'judges and clerks in the Southern District [of] New York'" and demeaned her. (*Id.* ¶ 60.) These interactions triggered Plaintiff's anxiety and depression. (*Id.* ¶¶ 7, 62.)

Plaintiff was concerned that the stress of this experience would trigger her health condition, and decided to make it "clear that she would not put up with such abusive behavior." (*Id.* ¶¶ 63–64.) So, on April 11, 2023, Plaintiff emailed Defendant Sapp stating that "you have been extremely rude and disrespectful" and suggesting that next time he were to "speak to [her] in a rude and condescending manner," they could "go down to Human Resources and resolve the

issue with an intermediary." (*Id.* ¶ 65.)[1]  In his response, Sapp said that he did not believe that he had been rude or disrespectful, but considered the incident to be a "conversation." (*Id.* ¶ 66.)

Sapp then "subject[ed] [Plaintiff] to a discriminatory and retaliatory hostile work environment" where she was "isolated, excluded, and unwelcome in the office" at Sapp's direction. (*Id.* ¶ 6; *see also id.* ¶ 67.)  He began to work in his office "with the door closed at almost all times," despite previously working with his door open and welcoming Plaintiff in. (*Id.* ¶ 68.)  He "rolled his eyes" at, "shot . . . glares" at, and "consistently avoided making eye contact" with Plaintiff when they were in the same room. (*Id.* ¶ 69.)  He also tried to "freeze Plaintiff out" by "exclud[ing] her from important emails, meetings, and conversations critical to her role." (*Id.* ¶ 70.)

With her anxiety and depression worsening, Plaintiff began to see a therapist to cope with her work environment. (*Id.* ¶ 72.)  She also reported Sapp's behavior to Amalgamated's Head of Human Resources, Defendant Bostic. (*Id.* ¶¶ 6, 73–75.)  Plaintiff says that Defendant Bostic was "unsurprised" by her claims, and, in her view, it was "obvious that she had heard similar claims" about Defendant Sapp's treatment of female employees. (*Id.* ¶ 76.)  But, rather than being sympathetic, Defendant Bostic told Plaintiff "things would get better"; Plaintiff "felt hopeless that HR did not seem to care." (*Id.* ¶¶ 76–77.)  Rather than addressing the situation, Bostic told Sapp that Plaintiff had complained against him, allegedly in keeping with a pattern of directly approaching male employees with such complaints rather than investigating the incidents giving rise to the complaints. (*Id.* ¶¶ 7, 78–79.)

---

[1] Elsewhere in her Complaint, Plaintiff describes this as her threatening to report Sapp to Human Resources. (FAC ¶ 5.)

Plaintiff says that after she confided in Stuben, the paralegal told her about another instance of Defendant Sapp berating a female employee. (*Id.* ¶¶ 80–82.) Plaintiff then allegedly emailed Defendant Bostic, informing her of these allegations. (*Id.* ¶¶ 83–84.) Defendant Bostic said she was unaware of any such history. (*Id.* ¶ 85.)

On or around April 15, 2023, Plaintiff again received a merit-based raise of 3%. (*Id.* ¶ 88.) The review and decision to award her this raise allegedly "took place prior to [her] objections to . . . Sapp's discriminatory treatment and reports to HR." (*Id.*)

Plaintiff alleges that Sapp shortly and suddenly "launched a retaliatory campaign against her, falsely accusing her of not being in the office" (because he had not seen her in the office while his door had been closed) "to make her look bad[,] . . . aggressively reprimanding her[,] and subjecting her to physical violence." (*Id.* ¶¶ 91–92; *see also id.* ¶ 7.) Specifically, Plaintiff says that Sapp once "threw objects at her in a fit of rage," in front of several bystanders. (*Id.* ¶ 7.) This incident, she said, was precipitated by Sapp's incorrect belief that she "calculat[ed] a demand wrong" even though her calculation was correct. (*Id.* ¶ 94.) Sapp accused Plaintiff of doing "everything wrong for the past six months" and "messing everything up," before throwing paper at her. (*Id.* ¶ 95 (quotation marks omitted).) Plaintiff says that multiple employees who overheard the outburst told her that they "were scared" when they heard the altercation. (*Id.* ¶ 100.)

Plaintiff immediately reported the behavior to Defendant Bostic and to Defendant Burston, who was General Counsel and Senior Vice President at Amalgamated. (*Id.* ¶¶ 8, 101.) Defendant Bostic was not in the office, so Plaintiff "contacted her via text message on her personal cell phone" to ensure the incident was reported. (*Id.* ¶ 102.) The following day, on June 30, 2023, Plaintiff received an email from Defendant Sapp, copying Defendant Bostic and

Defendant Burston, stating that their "conversation the day before had raised several red flags." (*Id.* ¶¶ 103–04 (quotation marks omitted).) Defendant Sapp "disingenuously wrote" that her "work was inaccurate" and that he had issues with the manner in which she performed her work. (*Id.* ¶ 105.) He asked her to send all draft audit bill demand letters with supporting documents to him for review prior to those letters being sent to the employer. (*Id.* ¶ 106.) Plaintiff says that she had always copied Defendant Sapp on such communications prior to this communication, and always provided him with copies before such letters went out. (*Id.* ¶ 107.) Plaintiff says that Defendant Sapp sent this email to provide post-hoc justification for his harsh and inappropriate treatment of her the day before. (*Id.* ¶ 108.) Plaintiff says that she began experiencing "extreme anxiety" at work and felt as though she was "having a heart attack." (*Id.* ¶ 109.)

Plaintiff replied to the email and defended her work. (*Id.* ¶ 110.) Plaintiff described her account of the events that led to the allegedly incorrect calculation, and provided materials suggesting that the numbers were calculated by the Collections Department. (*Id.* ¶ 112.) She expressed her view that Defendant Sapp's email was an "attempt to justify [his] actions by painting [her] in a negative light." (*Id.*) She also referenced Defendant Sapp's alleged history of acting inappropriately with subordinates. (*Id.*) Defendant Sapp responded that he had not previously corrected her work because he had been giving her the "benefit of the doubt" and trusting her capabilities. (*Id.* ¶ 113.) He denied yelling at her, and "implied that if he had, it would have been justified [by] her 'inability to do her job in a professional, competent, and timely manner.'" (*Id.* ¶ 114 (alteration adopted).) He denied awareness of previous complaints, a denial which, in Plaintiff's view, demonstrates that "abuse . . . [was] not investigated or acted on" when it was reported. (*Id.* ¶ 117.)

Defendant Bostic "visited the Collections Department and spoke to staff who witnessed [the] . . . attack against Plaintiff," including an Administrative Assistant and two Paralegals who verified that Defendant Sapp "hurled objects at [Plaintiff] in a fit of rage." (*Id.* ¶¶ 119–20.)

On July 15, 2023, Plaintiff contacted Defendant Burston about the position she had applied for, which was still open, and "an interview was scheduled" for that August. (*Id.* ¶ 122.) As late as July 25, 2023, Defendant Burston made comments that led Plaintiff to believe that she was in the process of being promoted to Director of Compliance. (*Id.* ¶¶ 123–24.) However, on July 30, 2023, Plaintiff learned that Defendant Sapp had to recommend her before she would receive an interview. (*Id.* ¶ 125.)

On July 6, 2023, Plaintiff met with Defendants Bostic and Burston to review and discuss her April 2023 and June 2023 communications with HR regarding Defendant Sapp. (*Id.* ¶ 126.) Even though others corroborated Plaintiff's report, Defendants Bostic and Burston closed the Human Resources complaint against Defendant Sapp. (*Id.* ¶¶ 8, 127.) Defendant Bostic said that no further action would be taken against Defendant Sapp. (*Id.* ¶ 127.) Defendant Bostic and Burston told Plaintiff that Defendant "Sapp's negative comments about her performance would not be 'taken into consideration' and would not count against her." (*Id.* ¶ 130.) Defendant Burston advised Plaintiff to "take the higher ground" in her dealings with Defendant Sapp. (*Id.* ¶¶ 8, 132.) After the Human Resources complaint was closed, Plaintiff "began to experience feelings of hopelessness and emotional exhaustion"; she had "frequent migraines, could not sleep most nights" before work, and regularly "woke up [in a] sweat[] in the middle of the night." (*Id.* ¶ 133.)

The day after the meeting, on July 7, 2023, Plaintiff emailed Defendant Bostic. (*Id.* ¶ 134.) She said that she had alerted Defendant Bostic and Defendant Burston of "two prior

8

incidents" of Sapp mistreating "junior female employees in addition to the two incidents with

[Plaintiff]." (*Id.*) She described the above-mentioned incidents, and said that Sapp's actions,

and specifically his most recent email "fe[lt] like retribution because the accusations in the email

are all inaccurate and false and were only sent after his latest outburst." (*Id.*)

Plaintiff sent another email regarding these events on July 13, 2023. (*Id.* ¶ 135.)

Defendant Bostic responded on July 20, 2023. (*Id.* ¶ 136.) She expressed that she was

"confident in [the] decision to take no further action at this time," and "consider[ed] the matter

closed." (*Id.*)

In August 2023, Plaintiff interviewed for the Director of Compliance position to which

she had applied. (*Id.* ¶ 139.) However, she learned in mid-September 2023 that she would not

receive this promotion. (*Id.*; *see also id.* ¶ 9.) On information and belief, Plaintiff alleges that

she did not receive the position "not because there was another candidate who impressed

leadership more," as indicated by the fact that the role had been open for several months and

remained vacant for months later. (*Id.* ¶ 140.) She asserts, on information and belief, that she

was denied the promotion solely in retaliation for reporting Defendant Sapp to Human Resources

and refusing the drop the issue after Human Resources deemed the complaint closed. (*Id.* ¶ 141.)

In mid-September 2023, Plaintiff learned that she would have a mid-year performance

review with Defendants Sapp and Burston, retroactive to June 30, 2023. (*Id.* ¶ 142.) She was

not aware of any other employees in her Department who received a mid-year review—up until

that point, her reviews at Amalgamated had been annual. (*Id.* ¶ 143; *see also id.* ¶ 9.) She was

also surprised that Defendant Burston would be involved in her review because, she says, this

was not typical. (*Id.* ¶ 144.) Plaintiff was anticipating a "negative, retaliatory review," as she

thought Amalgamated would "establish a false record of poor performance" to force her to

resign, but she was nevertheless "alarmed by the harsh critique of her performance" that occurred at this review, "and grew fearful that her job was at risk" as a result of her Human Resources reports. (*Id.* ¶¶ 145–46.)

After the review, Plaintiff emailed Defendants Sapp, Burston, and Bostic, and copied Defendant Mallen. (*Id.* ¶ 149.) She said that she "wholly reject[ed]" the review, making the accusation of "false claims" about her performance that began only after she complained about Defendant Sapp. (*Id.* ¶ 150.) She called these claims a "pathetic distraction to [Sapp's] inappropriate behavior towards [her] and other female subordinates" and said that Defendant Burston did not adequately investigate the claims against Defendant Sapp. (*Id.*) Plaintiff says that these events caused her "harmful levels of stress" and led to "constant" anxiety and poor health. (*Id.* ¶ 152.)

On October 16, 2023, Plaintiff reported the impact of these actions on her anxiety and depression to Defendant Bostic, sent Defendant Bostic notes from a therapy session suggesting that her work was the "root cause of her exacerbated anxiety symptoms," and expressed the hope that Amalgamated would support her receiving disability accommodations. (*Id.* ¶¶ 9, 155–57.) Defendant Bostic referred Plaintiff to Defendant Grace Perri, who was a Human Resources Officer at Amalgamated. (*Id.* ¶¶ 10, 158.) Plaintiff contacted Defendant Perri on or around October 20, 2023. (*Id.* ¶ 159.) Defendant Perri, Plaintiff says, "questioned the legitimacy of her disability, refused to accommodate her, and did not address her concerns." (*Id.* ¶ 10.) Specifically, Defendant Perri asked, in a condescending tone, "What kind of disability is that?" when Plaintiff disclosed her Generalized Anxiety Disorder and Major Depressive Disorder diagnoses. (*Id.* ¶ 160.) Plaintiff presented Perri with supporting note from her therapist, who suggested that Plaintiff receive an additional work from home day for a six-month period. (*Id.*

10

¶¶ 161–62.)  According to Plaintiff, many "non-disabled employees . . . already received an additional day of work-at-home . . . for various reasons"; the firm had a one-day work from home policy, which it had recently adopted after formerly having a two-day work from home policy.  (*Id.* ¶ 162.)  Without justification, this request was denied.  (*Id.* ¶ 163.)  Amalgamated provided no opportunity for an "interactive dialogue" regarding the request.  (*Id.* ¶ 164.)

For the remainder of October 2023, Defendant Sapp increased the "frequency and viciousness" of his treatment of Plaintiff.  (*Id.* ¶ 165.)  On November 5, 2023, Defendant Sapp emailed to Plaintiff an accusation that she had made a miscalculation on a demand letter, a claim Plaintiff contested via email.  (*Id.* ¶ 166.)  Plaintiff says that Defendant Sapp also "made urgent requests and created arbitrary deadlines" to set Plaintiff up for failure.  (*Id.* ¶ 167.)

In early November 2023, Plaintiff emailed Defendants Bostic, Burston, and Mallen regarding the ongoing retaliation.  (*Id.* ¶ 170–71.)  She expressly referenced the anxiety she was experiencing as a result, and asked Defendant Burston what actions would be taken to accommodate her disability.  (*Id.* ¶ 171–72.)  Defendant Burston did not respond.  (*Id.* ¶ 173.)

On November 6, 2023, Defendant Sapp "effectively demoted Plaintiff by removing her from various cases."  (*Id.* ¶ 174.)  On November 9, 2023, Plaintiff was called into a meeting with Defendants Bostic and Burston, during which Bostic told Plaintiff she was being terminated due to poor performance.  (*Id.* ¶ 175–76.)  During the meeting, Plaintiff says that she again reported retaliation and asked "if the true reason she was being fired from Defendant Amalgamated was . . . her continued reports against Defendant . . . Sapp."  (*Id.* ¶ 178.)  Defendant Bostic maintained that she was not being fired for that reason.  (*Id.* ¶ 179.)

B. Procedural Background

Plaintiff commenced this Action in the Supreme Court of the State of New York, County of Westchester on September 17, 2024. (*See* Notice of Removal, Ex. A, at 2–3 (Dkt. No. 1-1).) She filed a complaint in that Court on October 25, 2024. (*See id.* at 6–52.) Defendants removed the case to the United States District Court for the Southern District of New York on November 22, 2024. (*See* Notice of Removal, Ex. B, at 2 (Dkt. No. 1-2).)

Defendants filed a premotion letter seeking a conference addressing an anticipated Motion to Dismiss the initial complaint on December 26, 2024. (*See* Letter from Michael Slocum, Esq. to Megan Goddard, Esq. (Dec. 26, 2024) (Dkt. No. 9).) The Court held a pre-motion conference on January 24, 2025. (*See* Dkt. (minute entry for proceedings held on Jan. 24, 2025).) At that conference, Plaintiff was directed to file an Amended Complaint by February 14, 2025. (*Id.*)

On February 14, 2025, Plaintiff filed her Amended Complaint, the operative complaint in this Action. (*See* FAC.) On March 7, 2025, Defendants again filed a premotion letter seeking a conference addressing an anticipated Motion to Dismiss the Amended Complaint. (*See* Letter from Michael Slocum, Esq. to Megan Goddard, Esq. (Mar, 7, 2025) (Dkt. No. 23).) On May 5, 2025, the Court held a pre-motion conference and set a briefing schedule. (*See* Dkt. (minute entry for proceedings held on May 5, 2025).)

On June 4, 2025, Defendants filed the Motion to Dismiss (the "Motion"), (*see* Mot.), as well as a memorandum of law in support thereof, (*see* Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 28)). On July 2, 2025, Plaintiff filed her Memorandum of Law in Opposition to the Motion. (*See* Mem. of Law in Opp'n ("Pl.'s Opp'n") (Dkt. No. 29).)

12

Defendants filed their Reply Brief on July 16, 2025.  (*See* Reply Mem. of Law ("Reply") (Dkt. No. 30).)

## II.  Discussion

### A.  Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).

#### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (internal quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and

plausibly suggest that the plaintiff has standing to sue." *Id.* (alterations adopted) (quoting

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  In making such a

determination, a court must accept as true all allegations in the complaint and draw all inferences

in the plaintiff's favor.  *Id.* at 57.  However, where a Rule 12(b)(1) motion is fact-based and a

defendant proffers evidence outside the pleadings, a plaintiff must either come forward with

controverting evidence or rest on the pleadings if the evidence offered by the defendant is

immaterial.  *Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017).  If the extrinsic

evidence presented by the defendant is material and controverted, the Court must make findings

of fact in aid of its decision as to standing.  *Carter*, 822 F.3d at 57.

 2. Rule 12(b)(6)

 The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

[or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of

Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal

quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a

right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim

has been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a

claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [her] claims

across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also*

*Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.  But where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation

omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

"draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145

(2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must

confine its consideration to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial

notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)

(internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317

(S.D.N.Y. 2016) (same).

B.  Analysis

    1.  Subject Matter Jurisdiction & Election of Remedies

    Defendants move to dismiss Counts 7–9, asserted under the NYSHRL, arguing that these

claims are barred by an election of remedies provision under New York law.  (Defs.' Mem. 14–

16.)[2] Defendant makes this argument based on a copy of Plaintiff's EEOC Form 5, (the "Form"), which it attaches as an exhibit. (*See* Defs.' Mem., Ex. A (Dkt. No. 28-1).) EEOC Form 5 includes a line, which the complainant fills out, for "State or local Agency, if any" and a section, which is pre-printed, that states in part, "I want this charge filed with both the EEOC and the State or Local Agency, if any." (*Id.* at 2.) *See also* EEOC Form 5 (2025), https://www.eeoc.gov/sites/default/files/2025-12/EEOC_Form_5_Charge_of_Discrimination_-_May_2025.pdf [https://perma.cc/PE53-VEXE].[3] On Plaintiff's EEOC Form 5, the "State or local Agency, if any" line is filled out with "New York State Division [o]f Human Rights." (Defs.' Mem., Ex. A, at 2.) It also bears the pre-printed section that states "I want this charge filed with both the EEOC and the State or Local Agency, if any." (*Id.*) Plaintiff responds that she filed no charge of discrimination with a state or local agency, that this language is not an election of remedies and, in any event, that even if she had filed such a claim, she would not be barred from raising the NYSHRL counts here. (Pl.'s Opp'n 10–12.) She takes the position first that the language included in the Form reflects routine cross-filing of a claim with state or local agencies, (*id.* at 10), and that if she had elected a state remedy, she could request an administrative closure of any resulting state investigation, which would cure any jurisdictional issue, (*id.* at 11). In reply, Defendants further attach an excerpt of her EEOC Case File. (*See*

---

[2] When citing to the Parties' filings, the Court refers to the page numbers as designated by the Court's Electronic Case Filing System, which appear in the upper right-hand corner of each page.

[3] The Court takes judicial notice of this copy of EEOC Form 5, which was retrieved from an official government website. *Rynasko v. New York Univ.*, 63 F.4th 186, 191 (2d Cir. 2023) ("When considering a motion made pursuant to Rule 12(b)(6) we may take judicial notice of documents from official government websites.") (quotation marks omitted); *Collins v. City Univ. of New York*, No. 21-CV-9544, 2023 WL 1818547, at *1 (S.D.N.Y. Feb. 8, 2023) ("The Court may take judicial notice of publicly available documents and information on official government websites.").

Reply, Ex. 1 (Dkt. No. 30-1).) They argue that this excerpt "reflects that the Commission notified the NYSDHR at least twice of Plaintiff's dual filed charge, on August 12 and October 16, 2024, in accordance with her election to have the charge dual filed." (Reply 6.)

To the extent that it relies on the EEOC form, Defendants' challenge is facial, even though the EEOC form was not attached to Plaintiff's Complaint. The "complaint is deemed to include any . . . materials incorporated in it by reference and documents . . . integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). Accordingly, "[w]hen a party raises a facial challenge to the court's subject matter jurisdiction . . . [t]he court may . . . consider documents incorporated by reference in, attached to, or integral to the complaint." *Concern for Indep. Living, Inc., v. Town of Southampton*, No. 24-CV-7101, 2026 WL 707387, at *5 (E.D.N.Y. Mar. 12, 2026); *see also MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co.*, No. 19-CV-524, 2022 WL 2439410, at *3 (W.D.N.Y. Mar. 28, 2022) (same). The Charge of Discrimination is incorporated by reference in Plaintiff's Complaint, and therefore properly before the Court. (FAC ¶ 14 ("Plaintiff timely filed a Charge of Discrimination with the New York district office of the Equal Employment Opportunity Commission[.]").) *See also Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp. 3d 504, 510 n.3 (S.D.N.Y. 2014) (concluding that a complaint stating that the plaintiff "filed his EEOC Charge of Discrimination" at a specific time sufficed to render that document "incorporate[d] . . . by reference").

The EEOC case file, by contrast, is not incorporated by reference in, attached to, or integral to the Amended Complaint. (*See generally* FAC.) Courts do not regularly consider these case files at the Motion to Dismiss stage. *See Byrne v. Telesector Res. Grp., Inc.*, No. 04-CV-76S, 2005 WL 464941, at *4 (W.D.N.Y. Feb. 25, 2005) (declining to consider EEOC case file submitted by the defendant), *aff'd*, 339 F. App'x 13 (2d Cir. 2009). Accordingly, it is

"extrinsic evidence," and reliance on it would constitute a fact-based challenge.  *See Ham v.*

*Lenovo (United States) Inc.*, 664 F. Supp. 3d 562, 575 (S.D.N.Y. 2023) (explaining that the

defendant's challenge was fact-based where it relied on extrinsic evidence).  The Court

determines first whether the materials submitted by Defendants "reveal the existence of factual

problems in the assertion of jurisdiction," in which case Plaintiff would need to "come forward

with evidence . . . to controvert that presented by [D]efendant[s]."  *Carter*, 822 F.3d at 57; *see*

*also Ham*, 664 F. Supp. 3d at 575 (same).  In contrast, if the evidence presented is "immaterial

because it does not contradict plausible allegations that are themselves sufficient to show

standing," *Carter*, 822 F.3d at 57, "then the Court need only rely on the allegations in Plaintiff's

[Amended] Complaint" and the materials incorporated therein, *Ham*, 664 F. Supp. 3d at 575.

For reasons explained further below, the Court determines that this evidence does not reveal the

existence of a factual problem in the assertion of jurisdiction because it is entirely consistent with

Plaintiff's assertion that she did not cross-file her Charge of Discrimination with a state agency.

Accordingly, the Court will "rely on the allegations of the [Amended] Complaint [and materials

incorporated therein] in opposition to the [M]otion to [D]ismiss" to the extent that it asserts that

Plaintiff lacks standing to sue.  *Ham*, 664 F. Supp. 3d at 577.

Applying New York law, the Court concludes that Plaintiff's filing of the EEOC Form 5

did not constitute an election to pursue administrative remedies, and no jurisdictional bar applies.

The election of remedies provision in the NYSHRL states:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall
> have a cause of action in any court of appropriate jurisdiction for damages . . .
> unless such person had filed a complaint hereunder or with any local commission
> on human rights . . . provided that, where the division has dismissed such complaint
> on the grounds of administrative convenience, on the grounds of untimeliness, or
> on the grounds that the election of remedies is annulled, such person shall maintain
> all rights to bring suit as if no complaint had been filed with the division.

18

N.Y. Exec. L. § 297(9) (emphasis added). Under this provision, an individual "must choose whether to press a NYSHRL claim in an administrative forum established under the NYSHRL (or an equivalent local forum), or in a court of appropriate jurisdiction." *Illie-Stout v. Barrier Free Living, Inc.*, No. 08-CV-6388, 2009 WL 81151, at *1 (S.D.N.Y. Jan. 12, 2009). "Generally, the remedies of administrative review through the Human Rights Division or judicial review are mutually exclusive." *Moodie v. Fed. Reserve Bank of New York*, 58 F.3d 879, 882 (2d Cir. 1995); *see also Saunders v. NYC Dep't of Educ.*, No. 07-CV-2725, 2010 WL 2816321, at *8 (E.D.N.Y. July 15, 2010) ("The remedies are mutually exclusive . . . ."), *on reconsideration on other grounds,* 2010 WL 2985031 (E.D.N.Y. July 20, 2010). The bar established by the election of remedies provision is jurisdictional, and where it applies a federal court may not hear a claim that has already been resolved in the state administrative forum, absent the applicability of the exceptions quoted above. *Id.*; *see also Illie-Stout*, 2009 WL 81151, at *1 ("Unless the claim is dismissed by the administrative body for one of the enumerated procedural reasons, the election of remedies provision under the NYSHRL presents an 'insuperable jurisdictional bar' to a federal court hearing a claim that has already been litigated in the state administrative forum."); *Waller v. Muchnick, Golieb & Golieb, P.C.*, 523 F. App'x 55, 56 n.1 (2d Cir. 2013) (summary order) ("[A] litigant who files a claim with the NYSDHR cannot bring the same claim [under the NYSHRL] in federal court.").

In most cases involving the election of remedies doctrine, there is evidence before the court that the plaintiff has directly pursued a claim before an administrative tribunal. *See, e.g.*, *Saunders v. NYC Dep't of Educ.*, No. 07-CV-2725, 2010 WL 2816321 (E.D.N.Y. July 15, 2010) ("Since the NYSDHR investigated and ruled on the merits of [the] plaintiff's complaints in that forum, the election of remedies doctrine precludes [the] plaintiff from pursuing her NYSHRL

19

and NYCHRL claims arising from those same allegations in this [c]ourt."), *on reconsideration on other grounds*, 2010 WL 2985031 (E.D.N.Y. July 20, 2010); *Illie-Stout*, 2009 WL 81151, at *2 ("[The] plaintiff's claims under the NYSHRL and the NYCHRL are barred by the laws' election of remedies provisions because she has already litigated the claims before the Division of Human Rights."). Nevertheless, it appears that the mere filing of a complaint with an administrative tribunal is sufficient for the jurisdictional bar to apply. *See Samuels v. Barnard Coll.*, No. 23-CV-6181, 2024 WL 5718124, at *15 (S.D.N.Y. Oct. 3, 2024) (recommending that claims be dismissed on jurisdictional grounds where plaintiff "filed at least two complaints to [an administrative entity] regarding" the claims at issue), *report and recommendation adopted*, 2025 WL 27683 (S.D.N.Y. Jan. 3, 2025); *Luckie v. N. Adult Day Health Care Ctr.*, 73 N.Y.S.3d 454, 454 (App. Div. 2018) ("Pursuant to the election of remedies doctrine, the filing of a complaint with the Division precludes the commencement of an action in the Supreme Court asserting the same discriminatory acts." (quotation marks omitted and alteration adopted)). And, in circumstances where a complaint "was pending before the administrative agency at the same time that the lawsuit in state court was pending," state court decisions suggest that the "maintenance of the court action" should be "conditioned" "on the plaintiff filing a disclaimer and withdrawing [her] administrative complaint." *Scott v. Carter-Wallace, Inc.*, 521 N.Y.S.2d 614, 616 (Sup. Ct. 1987), *aff'd as modified on other grounds*, 541 N.Y.S.2d 780 (1989).

However, New York courts hold that, where a plaintiff "personally file[s] a complaint with the Division of Human Rights, the action would be barred," whereas, if the EEOC "refers a complaint to the Division of Human Rights on behalf of a grievant, the grievant is not prohibited from commencing a state court action involving the same claim." *Scott*, 521 N.Y.S.2d at 616. The EEOC's own instructions for filing explain that in "states and localities [that] have agencies

20

that enforce laws prohibiting employment discrimination" the EEOC and some of these agencies "have worksharing agreements in place to prevent the duplication of effort in charge processing," pursuant to which "if [a complainant] file[s] a charge with either EEOC or [state or local agency], the charge also will be automatically filed with the other agency" in a process termed "dual filing." *See How to File a Charge of Employment Discrimination*, U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/how-file-charge-employment-discrimination [https://perma.cc/8VR8-VZNG] (last visited Feb. 19, 2026); *see also Douglas v. Naik Consulting Grp.*, No. 24-CV-7237, 2025 WL 2042430, at *5 n.3 (S.D.N.Y. July 21, 2025) ("The EEOC-NYSDHR work-sharing agreement typically results in dual filing, but courts have held that *only* an active investigation by NYSDHR constitutes an 'election' pursuant to state law.  Under a work-sharing agreement, the agencies coordinate investigations to prevent duplication and ensure charges are processed under both federal and state anti-discrimination laws.  This allows a single complaint to be dual-filed and handled by one agency on behalf of both." (citation omitted, emphasis in original)).[4]  The few cases that have considered the question of whether complaints that have been "dual filed" are subject to the election of remedies jurisdictional bar have concluded that they are not.  As one court explained, "filing an EEOC complaint to comply with the requirements of Title VII does not qualify as the filing of a complaint within the meaning of the [NYS]HRL.  Accordingly, a discrimination complaint filed with the EEOC that the EEOC then cross-files with DHR is not deemed to be an election of administrative remedy." *Krause v. Kelehan*, No. 17-CV-1045, 2018 WL 2021484, at *7

---

[4] As explained above, the EEOC's webpage describing these work-sharing agreements is judicially noticeable on a motion to dismiss for failure to state a claim because it is an official government website.

(N.D.N.Y. Apr. 26, 2018) (quotation marks and citation omitted).  The reference to the state

agency in the caption may simply reflect that the "EEOC automatically cross-filed [Plaintiff's]

grievance with" the state agency.  *Id.*  So, the Court concludes, at least at this stage, that Plaintiff

has simply preserved her right to sue by filing a charge of discrimination with the EEOC, and

that the reference to the state administrative tribunal does not trigger the jurisdictional bar.  *See*

*Douglas*, 2025 WL 2042430, at *5 (concluding that the plaintiffs did not elect to pursue

administrative remedies where the plaintiffs "filed their charges directly with the EEOC," rather

than the administrative tribunal, and argued that "the EEOC form regarding dual-filing is

boilerplate and does not reflect a voluntary election on their part," and there was, they asserted,

"no charge currently pending with" the administrative tribunal, even though the defendant took

the view that cross-filing constituted an election of remedies); *Oliver Cyrus v. Lockheed Martin*

*Corp.*, No. 22-CV-4115, 2025 WL 964016, at *10 (E.D.N.Y. Mar. 31, 2025) ("Additionally, a

discrimination complaint filed with the EEOC that the EEOC then cross-files with DHR is not

deemed to be an election of administrative remedy that precludes a plaintiff from bringing suit in

court." (quotation marks and citation omitted)), *reconsideration denied sub nom. Cyrus v.*

*Lockheed Martin Corp.*, 2025 WL 1638056 (E.D.N.Y. May 9, 2025); *Capobianco v. Sandow*

*Media Corp.*, No. 11-CV-3162, 2012 WL 4561761, at *5 (S.D.N.Y. Sept. 29, 2012) (noting that

"where a complaint is filed directly with the EEOC, and then only filed with the [NYSDHR] by

the EEOC pursuant to Title VII requirements, the jurisdictional bar, New York Executive Law

section 297(9), does not apply. . . ." and "[g]iven that [the p]laintiff did not independently file

any state or city administrative claim, she is not barred from pursuing her NYSHRL and

NYCHRL claims in this Court" (citations and quotation marks omitted)); *Young v. United Parcel*

*Serv. Gen. Servs. Co.*, No. 11-CV-4105, 2012 WL 847574, at *2 (E.D.N.Y. Mar. 12, 2012)

(describing exception to election of remedies doctrine that applies where complaint "was 'dually filed' with the Equal Employment Opportunity Commission ('EEOC') pursuant to the Title VII requirement that all complaints filed directly with that federal agency be referred to the local agency").

Defendants cite *Symotyuk-Knoll v. HealthEquity, Inc.*, No. 21-CV-08348, 2023 WL 5576405 (S.D.N.Y. Aug. 29, 2023), and argue that in that case, the plaintiff filed a charge with the EEOC and elected to dual file on the Form 5, (Reply 7).  However, the opinion in *Symotyuk-Knoll* does not mention EEOC Form 5; rather, it says that the plaintiff (as alleged in the complaint in *Symotyuk-Knoll*) filed a charge of discrimination with both agencies. 2023 WL 5576405, at *2–3.  The court therefore concluded that the plaintiff had elected to pursue administrative remedies and, although the plaintiff had provided evidence that she had requested that the state tribunal dismiss her complaint or annul her election of remedies, she had provided no evidence that the tribunal did, in fact, do so.  *Id.* at *3.  At least from the face of that court's opinion, there is no indication that any party argued that the plaintiff had not elected her remedies because the contact with the state tribunal arose from dual filing.  And, the plaintiff in that action apparently alleged in her own complaint that she had filed a complaint with the state tribunal.  The Court therefore concludes that *Symotyuk-Knoll* does not support dismissal of Plaintiff's state law claims.

As mentioned above, the Court concludes that the EEOC case file is "immaterial" to the jurisdictional question because it is not inconsistent with Plaintiff's claim that she filed her Charge of Discrimination only with the EEOC.  The document identifies the New York State Division of Human Rights as the "Deferral Office" for the Charge of Discrimination.  (*See* Reply, Ex. 1, at 4.)  The term "Deferral Office" refers to an "agency that shall process a dual-

filed complaint" in the event that a dual-filed case is determined to be processed first by the state agency. *See* 29 C.F.R. § 1640.11. From the EEOC file, it seems that after it was identified by the "Deferral Office," the New York State Division of Human Rights took no further action; accordingly, the EEOC eventually closed the case and sent a "[d]ual filing notification" to the state administrative tribunal. (Reply, Ex. 1, at 2.) There were no further developments in the case file until the FOIA request by Defendants. (Reply, Ex. 1 at 2 (noting "Closure Notice/NRTS" downloaded by multiple parties).) These materials are not inconsistent with Plaintiff's theory of jurisdiction—namely, that she filed her charge with the EEOC, not the New York State Division of Human Rights. (*See* FAC ¶ 14.) Accordingly, they are not material to the jurisdictional issue here, and the Court may rely entirely on the pleadings in the Amended Complaint. *See Ham*, 664 F. Supp. 3d at 576–77 (declining to consider external materials that were consistent with asserted theory of injury); *New York v. United States Dep't of Agric.*, 454 F. Supp. 3d 297, 306–07 (S.D.N.Y. 2020) (declining to consider extrinsic materials that were "not the type of affirmative evidence sufficient to place an added evidentiary burden on [the] plaintiffs"); *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 17-CV-855, 2018 WL 1585673, at *3–4 (S.D.N.Y. Mar. 28, 2018) (same).

Of course, if it becomes apparent at a later stage that Plaintiff did, in fact, affirmatively pursue relief in an administrative forum, Defendants may again raise whether dismissal is appropriate due to Plaintiff's election of remedies.

2. Individual Defendant Claims

Next, Defendants argue that Plaintiff has failed to state any NYSHRL claims against the Individual Defendants. (Defs.' Mem. 16–17.) Defendants make a (somewhat implicit) argument that a 2021 decision of the New York Court of Appeals, *Doe v. Bloomberg, L.P.*, 167 N.E.3d 454

24

(N.Y. 2021), eliminated individual liability under the NYSHRL except on an aiding and abetting theory.  (Reply 8–9 (asserting that courts in this district have dismissed NYSHRL claims against individual defendants where those defendants were individuals affiliated with the corporate entity).)  Plaintiff responds that *Bloomberg* does not stand for this proposition; rather, she submits, *Bloomberg* and cases applying its rule involve circumstances where a plaintiff seeks to hold "an individual associated with a corporate employer vicariously liable for another individual's conduct."  (Pl.'s Opp'n 12.)   So, she reasons, even after *Bloomberg* many courts have held that individuals may be held liable for their own conduct under the NYSHRL.  (*Id.* at 13.)

It is true that *Bloomberg* clarified the definition of an "employer" under the New York State Human Rights law.  *See Bloomberg*, 167 N.E.3d at 458–60.  In that case, the New York Court of Appeals explained that an individual employee at a defendant corporate employer would not be subject to suit—even if that employee had a title as an officer and was a manager— under N.Y. Exec. L. § 296(1).  *Bloomberg*, 167 N.E.3d at 458–60.  This is because, the Court elaborated while interpreting an earlier decision, "the state statutes, under which a corporate employee simply does not qualify as an 'employer,' regardless of the employee's position or relationship to the employer."  *Id.* at 459.  However, *Bloomberg* did not hold that an individual who is alleged to have directly participated in discriminatory behavior at a corporate employer can *never* be held individually liable under the NYSHRL—simply that that individual is not properly understood as an "employer" and so cannot be liable under § 296(1).  So, as the Court of Appeals explained in *Bloomberg* while interpreting a similar provision of the City Human Rights law, there can be a difference between "the liable party (employer) and the party

25

committing the offending conduct (employee or agent with managerial or supervisory responsibility)." *Id.* at 460.

Indeed, the Court of Appeals took great pains to clarify that it was not reaching "[a]ny claims that [the individual defendant] engaged in offending conduct against plaintiff by discriminating, aiding and abetting discrimination, or retaliating are not advanced in this appeal." *Id.* at 463. Another way to state that reservation is that the Court of Appeals was not reaching the possibility of liability under N.Y. Exec. L. § 296(6). Section 296(6) provides that it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. L. § 296(6). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." *Rojas v. Roman Cath. Diocese of Rochester,* 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quotation marks omitted) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc v. Ellerth*, 524 U.S. 742 (1998)); *see also Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024) (holding that individuals may be held liable on a claim advanced under a Section 296(6) theory); *Santana v. Yonkers City Sch. Dist.*, 205 N.Y.S.3d 691, 698 (Sup. Ct. 2023) (granting summary judgment as to claim brought under § 296(1) against employee of school, but denying summary judgment as to claims against same defendant on aiding and abetting theories); *Felton v. Monroe Cmty. Coll.*, 579 F. Supp. 3d 400, 410 (W.D.N.Y. 2022) (same, and noting that an individual defendant may be liable for aiding and abetting if he actually participates in conduct giving rise to claim); *Mahoney v. City of Albany*, 181 N.Y.S.3d 716, 725 (App. Div. 2022) (explaining aiding and abetting liability requires proof of active participation in the allegedly-discriminatory conduct); *Patrick v. Garlick,*

26

66 F. Supp. 3d 325, 332 (W.D.N.Y. 2014) (denying motion to dismiss NYSHRL claims against

supervisor because the plaintiff adequately alleged that the supervisor actively aided and abetted

in discrimination and retaliation, and collecting cases).  In addition to actually participating in the

conduct, the defendant must also "share[] the intent or purpose of the principal actor."

*McSweeney*, 776 F. Supp. 3d at 260 (alterations adopted, quotation marks and citations omitted).[5]

---

[5] The Court notes that there is a general rule that an individual cannot be held liable on an aiding and abetting theory where they are advancing only their *own* unlawful discrimination.  *See Baptiste v. City Univ. of New York*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023).  *Bloomberg*'s broad language, combined with the Court of Appeals' deliberately reserving discussion as to claims that involve direct participation in discrimination, appears to have led some courts to use broad language that would imply that there is *no* avenue to bring a claim under the NYSHRL against individuals who were themselves alleged to have been involved in discriminatory conduct.  *See, e.g.*, *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 289 (S.D.N.Y. 2024) ("The claims against the Individual Defendants, as Section 296(1) 'employers,' for disparate treatment discrimination and hostile work environment under must therefore be dismissed."); *Baxter v. Swiftshift Inc.*, No. 24-CV-6241, 2025 WL 1677712, at *9 (S.D.N.Y. June 13, 2025) (rejecting individual liability premised on ownership); *Chamale-Eustace v. State Univ. of New York at Stony Brook*, 249 N.Y.S.3d 218, 220 (App. Div. 2026) ("The Supreme Court also should have [dismissed] . . . the . . . causes of action[] alleging aiding and abetting discrimination against [a defendant], as he may not be held liable for aiding and abetting his own violation of the NYSHRL[.]").  This language led Defendants to that same conclusion. (Defs.' Mem. 6–7.) Indeed, there are a handful of district court cases that suggest that the decision in *Bloomberg* should sweep more broadly.  *Conlan v. Liberty Mut. Grp., Inc.*, No. 23-CV-8947, 2024 WL 4792112, at *6 (S.D.N.Y. Nov. 13, 2024) (concluding an argument was "rendered moot because the New York Court of Appeals has held that the NYSHRL does not render 'employers' individually liable").

For reasons described below, the only two Individual Defendants who may be held liable for NYSHRL claims here can each be held liable for aiding and abetting each other's and their employer's discrimination, and so the Court need not reach this question.  However, the Court notes its skepticism towards the conclusion that, as some decisions postdating *Bloomberg* have implied, because an individual cannot be held liable on an aiding and abetting theory for advancing their *own* discrimination, they therefore cannot be held liable on an aiding and abetting theory where their own involvement in the incident is alleged.  *See Conlan*, 2024 WL 4792112, at *6; *see also Trapani v. Freeport Pub. Sch. Dist.*, No. 24-CV-3005, 2025 WL 2306658, at *5 (E.D.N.Y. May 2, 2025) ("[C]ourts in this Circuit are split as to whether an individual can be held liable for aiding and abetting discrimination where, as here, his own conduct gave rise to the discrimination claim against the employer." (quotation marks omitted and alterations adopted)), *report and recommendation adopted*, 2025 WL 1812324 (E.D.N.Y. July 2, 2025).

So, the discussion of the State Human Rights law does not suggest that the New York

Court of Appeals meant to cut off *every* route by which an employee at a corporation might be

held individually liable based on his discriminatory actions.  It simply suggests that these

individuals are not "employers" and so are not liable under 296(1).  In short, at the Motion to

Dismiss stage, any claims premised on an employee of Amalgamated being Plaintiff's

"employer" such that Plaintiff could proceed against that individual under Section 296(1) must

be dismissed.  (*See* FAC ¶ 20 ("Defendant Supervisor Sapp . . . was Plaintiff's employer under

---

First and foremost, this conclusion runs counter to the logic of *Bloomberg* and would produce head-scratching results.  *Bloomberg* was concerned with the possibility of liability against an individual shareholder who, as alleged in the plaintiff's complaint, had *no* involvement in allegedly discriminatory action against the plaintiff.  *Bloomberg*, 167 N.E.3d at 453 ("She does not claim that [the defendant] had any 'personal participation' in the specific offending conduct.").  Still, the plaintiff attempted to name this individual as a defendant "employer" under the New York City Human Rights Law, which permits strict liability against an employer even where that employer was not alleged to be involved in the discriminatory activity of its employees.  *Id.* at 456.  The Court of Appeals rejected the possibility of liability in these circumstances, reasoning that an employee could not be held strictly liable under the City law on the facts alleged.  In other words, the reasoning of *Bloomberg* appears to be premised on the concern that individuals would become *personally liable* for discrimination that they were not involved with and did not advance or support in any way, although they did not qualify as a plaintiff's employer, simply by virtue of their position at a company.  *See id.* at 463 (criticizing a dissenting judge for relying on the defendant's "role" at the company, and observing that "[t]he litany of titles" held by the defendant "may well, in the dissent's view, make [the defendant] a 'captain of industry' but provides no guidance for imposing individual liability" (alteration adopted and citation omitted)).

So, the first source of the Court's skepticism is that, as described, the result that an individual who was directly involved in the discrimination could not be held liable, but one who was *indirectly involved* could be, simply seems beyond the ambit of the New York Court of Appeals' concerns in *Bloomberg*.  Second, as described, the discussion of liability under the *State* Human Rights Law in *Bloomberg* was mere dicta.  *Garcia v. Westhampton Primary Care*, No. 23-CV-4319, 2025 WL 2614945, at *10 (E.D.N.Y. Sept. 10, 2025) (expressing doubt as to the propriety of relying on this portion of *Bloomberg*, given that the statements were made "in dicta").  Third, and more importantly, the Court of Appeals expressly indicated that it was not considering "[a]ny claims that [the defendant] engaged in offending conduct against [the] plaintiff by discriminating, aiding and abetting discrimination, or retaliating . . . in th[e] appeal." *Bloomberg*, 167 N.E.3d at 463.

the NYSHRL.").)  But to the extent that Plaintiff's allegations suffice to state a claim that the Individual Defendants "compelled" or "aided and abetted" discrimination under a Section 296(6) theory, then those claims should not be dismissed.

As to Defendant Sapp, Plaintiff alleges that Sapp was present at and participated in Plaintiff's allegedly atypical mid-year performance review along with Defendant Bostic and, Plaintiff says, his pretextual objections to her work performance led to her being let go from her job.  (*Id.* ¶¶ 142–46, 149.)  These allegations suffice, at least at the Motion to Dismiss stage, to state an aiding and abetting claim against Defendant Sapp.  As one New York state court has explained, allegations that harassing conduct "was instigated" by an individual Defendant contacting the Plaintiff's superiors and "mak[ing] false accusations" against her about issues including "work performance" and where, without that conduct, the complaint offers "no indication that her superiors would have subjected her" to the adverse employment action, suffices to state an aiding and abetting claim under the State Human Rights Law.  *Elco v. Aguiar*, 208 N.Y.S.3d 696, 699 (App. Div. 2024).  The difference between these facts and a traditional section 296(1) claim, like the one addressed in *Doe*, is that Defendant's actions are alleged to have indirectly caused discrimination by other actors, including her employer.  *Cf. Greenberg v. Seton Educ. Partners*, 227 N.Y.S.3d 870, 879 (Sup. Ct. 2025) ("[B]ecause all of the allegations . . . concern [the d]efendant . . . engaging directly in alleged discriminatory conduct, the [p]laintiff's claim for aiding and abetting discriminatory conduct asserted against [the d]efendant . . . must fail.").

As to Defendant Bostic, Plaintiff alleges that Bostic ostensibly tolerated Sapp's allegedly discriminatory actions when she reported them, (FAC ¶¶ 76–77), had continuously disregarded allegations of discrimination at Amalgamated, (*id.* ¶¶ 78–79), was copied on multiple messages

regarding her ongoing mistreatment (*id.* ¶¶ 101–02, 149), and undertook an investigation that, in Plaintiff's view, was inadequate, (*id.* ¶¶ 119–20). Defendant Bostic also met with Plaintiff to discuss her concerns, but ultimately closed the investigation and refused to reopen it. (*Id.* ¶¶ 126–27, 136.) Finally, Bostic was present at the meeting where Plaintiff was terminated for purported poor performance, told her she was being let go, and denied that it was due to her continued reports against Defendant Sapp. (*Id.* ¶¶ 175–79.) "[W]ithout more, aiding and abetting liability does not attach in this Circuit for failing to adequately investigate a claim of discrimination. Nor do the aiding and abetting laws expressly create liability for failure to remedy a complaint of discrimination." *Kulick v. Gordon Prop. Grp., LLC*, No. 23-CV-9928, 2025 WL 448333, at *15 (S.D.N.Y. Feb. 7, 2025) (alterations adopted, quotation marks and citation omitted). However, Bostic also is alleged to have participated in Plaintiff's firing which, she says, was pretextual and based on her continued reporting of Defendant Sapp's discriminatory behavior. This allegation, in combination with the others, is sufficient to allege that Defendant Bostic aided and abetted discriminatory actions and shared their intent. *See Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 333 (S.D.N.Y. 2024) (concluding that where it was alleged that the defendant encouraged another's discriminatory conduct, reinforced those individuals' acts, and failed to take remedial action, the plaintiff had fairly pled direct participation and common intent or purpose). (*See also* FAC ¶ 255 (alleging that Bostic "knowingly or recklessly aided and abetted the discrimination" of others by allowing it to occur and failing to investigate it).)

As to Defendant Burston, Plaintiff says that Burston was copied on messages describing the alleged mistreatment. (FAC ¶¶ 76–77, 149, 170–72.) Defendant Burston also met with Plaintiff to discuss her concerns, but ultimately closed the investigation. (*Id.* ¶¶ 126–27.)

Finally, Burston was allegedly present at and participated in her atypical mid-year performance review, and was present when Bostic told Plaintiff that she would be terminated due to poor performance. (*Id.* ¶¶ 142–46, 175–76.) These claims fail because, as described, aiding and abetting liability cannot attach for failure adequately to investigate a discrimination claim alone, nor do they create liability for failure to remedy a complaint. And, unlike Defendant Bostic, there is no allegation that Burston was actively involved in any way in any allegedly discriminatory action against Plaintiff. *See Drinks-Bruder v. City of Niagara Falls*, No. 22-CV-725, 2024 WL 1094980, at *12 (W.D.N.Y. Mar. 13, 2024) (dismissing claim against individual defendants where they were not alleged "in any way" to have participated in surviving NYSHRL claim against the employer); *Dobney v. Walt Disney Co.*, No. 23-CV-5380, 2024 WL 325336, at *6 (S.D.N.Y. Jan. 29, 2024) (declining to dismiss § 296(6) claim where allegations suggested that two of the defendants "participated in discriminatory acts"); *Edwards v. Jericho Union Free Sch. Dist.*, 904 F. Supp. 2d 294, 304 (E.D.N.Y. 2012) (dismissing claim under § 296(6) and finding plaintiff failed to allege that a defendant "actually participated in any discrimination" where the complaint contained no allegations beyond a "conclusory assertion that" there were "serious concerns" about the plaintiff's work performance).

Defendant Perri was allegedly Plaintiff's point of contact when she sought disability accommodations. (*Id.* ¶¶ 158–63.) Defendant Perri purportedly expressed condescension at the request, (*id.* ¶ 160), and her request was ultimately denied, (*id.* ¶ 163), but Plaintiff does not allege that Defendant Perri had any involvement in the denial. There is no allegation that Perri aided and abetted others' discriminatory actions based on Plaintiff's alleged disabilities or sex, and so there is no viable aiding and abetting claim under Section 296(6). *Cf. Miloscia v. B.R. Guest Holdings LLC*, 928 N.Y.S.2d 905, 917 (Sup. Ct. 2011) (denying summary judgment under

an aiding and abetting theory where material disputes of fact existed as to whether, and to what extent, an individual defendant "was involved in the decisions to hire, fire, and/or deny an accommodation to plaintiff"), *aff'd in relevant part*, 942 N.Y.S.2d 484 (App. Div. 2012); *see also Drinks-Bruder*, 2024 WL 1094980, at \*12 (dismissing claim against individual defendants were they were not alleged to have participated in employer's discrimination).

Defendant Mallen, the CEO of Amalgamated, was alleged to have mistreated female employees other than Plaintiff, (FAC ¶ 38) and had been copied on Plaintiff's messages about Defendant Sapp, (*id.* ¶¶ 149, 170–71).  Merely being aware of others' discriminatory actions, without taking any affirmative steps to encourage them or otherwise to participate in the discriminatory behavior, is insufficient on its own to support an aiding and abetting claim.  *See McKinley v. Eastchester Union Free Sch. Dist.*, 221 N.Y.S.3d 925, 925 (Sup. Ct. 2024) (dismissing an aiding-and-abetting claim under the NYSHRL where "there [we]re simply no allegations that [the defendant] participated in any discriminatory or retaliatory conduct against plaintiff"); *Almodovar v. City of New York*, 208 N.Y.S.3d 850, 850 (Sup. Ct. 2024) ("[T]o state a cause of action for aiding and abetting, [the p]laintiff must plead facts sufficient to show that [the defendant] was aware of the discrimination, and participated or condoned it"), *amended on other grounds on reargument,* 215 N.Y.S.3d 920 (N.Y. Sup. Ct. 2024).

Accordingly, to the extent that Plaintiff is attempting to assert a claim under Section 296(1) against the Individual Defendants, that claim is dismissed.  And any claim under Section 296(6) is dismissed against each individual defendant except Defendants Sapp and Bostic.[6]

---

[6] Relatedly, the New York Court of Appeals' ruling in *Bloomberg* had no bearing on the possibility of liability on a theory of retaliation under the NYSHRL.  That is because the New York State Human Rights law has a separate prohibition against retaliation, Section 296(7).  *See* N.Y. Exec. Law § 296.  In apparent recognition of the fact that an argument relying on

3.  Allegations of Disability

Defendants argue that Plaintiff's Generalized Anxiety Disorder and Major Depressive Disorder do not meet the definition of a disability under the Americans with Disabilities Act ("ADA").  (Defs.' Mem. 17–20.)  Defendants argue that Plaintiff's condition was caused by the circumstances of her job, and therefore cannot constitute a covered disability under the ADA. (*Id.*)[7]  The Court disagrees, as Plaintiff has alleged that her Major Depressive Disorder, at a minimum, constitutes a "disability" under the meaning of that term as defined in the ADA.

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. §  12102(2); *see also O'Hara v. Bd. of Coop. Educ. Servs.*, No. 18-CV-8502, 2020 WL 1244474, at *12 (S.D.N.Y. Mar. 16, 2020) ("Under the statutory scheme and related case law, a qualifying disability must limit a major life activity and the limitation must be substantial." (quotation marks omitted)).  This definition applies to all Titles of the ADA.  *Widomski v. State Univ. of New York (SUNY) at Orange*, 748 F.3d 471, 474 (2d Cir. 2014).  "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact."  *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. §  1630.2(j)(2)); *see also O'Hara*, 2020 WL 1244474, at *12 (same).

---

*Bloomberg* would not address such claims, Defendants do not argue that Plaintiff's retaliation claims may not be brought against the Individual Defendants.  (*See* Defs. Mem. 16–17.)

[7] Defendants do not argue that Plaintiff failed to allege that she is "disabled" within the meaning of the New York State Human Rights Law.  (*See generally* Defs.' Mem.)  The Court therefore does not address this issue.

However, "employees who are precluded only from doing their specific job, or from working under a specific supervisor, do not have a 'disability'" as defined by the ADA. *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020). "Rather, an employee alleging a substantial limitation in the major life activity of working must show that the limitation affects the ability to 'perform a class or broad range of jobs.'" *Id.* (alteration adopted).

At a minimum, major depressive disorder is considered "a physical or mental impairment" that, typically, constitutes a disability under the ADA. *Puranik v. Children's Place Servs. Co.*, No. 24-CV-4441, 2025 WL 2522442, at *5 (S.D.N.Y. Aug. 1, 2025) (noting that, in cases alleging a disability based on mental impairment, EEOC regulations suggest any mental disorder qualifies as a covered impairment, and that at a minimum major depressive disorder may constitute a mental impairment, and collecting cases), *report and recommendation adopted*, 2025 WL 2521122 (S.D.N.Y. Sept. 2, 2025); *Bordeaux v. Halstead Prop. Dev. Mktg. LLC*, No. 20-CV-1347, 2022 WL 484992, at *9–10 (S.D.N.Y. Feb. 16, 2022) (explaining major depressive disorder was a disability); *Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742, 2021 WL 4267815, at *11 (S.D.N.Y. Sept. 20, 2021) (distinguishing general "depression" and "generalized anxiety disorder" from major depressive disorder, which is "on the list of EEOC conditions likely to qualify as a disability by its very nature"). Even where a plaintiff has alleged that she experiences a mental impairment, however, she still must allege that her condition impacts a major life activity. *Puranik*, 2025 WL 2522442, at *6 (dismissing claim where the plaintiff did not "provide factual allegations that demonstrate how her conditions impacted her daily life activities"). In her FAC, Plaintiff claims that her major depressive disorder "substantially limits" her "sleep, concentration, and enjoyment of everyday life." (FAC ¶ 27.) She also alleges that, as her symptoms were exacerbated during her time working at Amalgamated, she "could not sleep

34

most nights before she had to be in the office, and regularly woke up sweating in the middle of the night." (*Id.* ¶ 133.) She claims that, even after leaving her role at Amalgamated, she has continued to experience "loss of enjoyment of life" as a result of her exacerbated depressive symptoms. (*Id.* ¶ 213.) Moreover, she has alleged that, even before her time at Amalgamated, Plaintiff left her job at a law firm on the understanding that the stress of the role would exacerbate both her underlying medical condition and her related Major Depressive Disorder. (*Id.* ¶ 29.) Although Plaintiff has not raised this point, the Court also notes that 28 C.F.R. § § 1630.2(j)(3)(ii)–(iii) provides "in virtually all cases," major depressive disorder will, "at a minimum," be considered to impose a substantial limitation on the "major life activity" of brain function.

Taken together, these allegations suggest that, at a minimum, Plaintiff's major depressive disorder is severe, extended in duration (i.e., predating and spanning the multiple years she worked at Amalgamated), and has substantially impacted her ability to work, as well as her ability to sleep. *See Limauro v. Consol. Edison Co. of New York*, No. 20-CV-03558, 2021 WL 466952, at *8 (S.D.N.Y. Feb. 9, 2021) ("[The plaintiff's] PTSD and major depressive disorder 'substantially limit[]' his 'abilit[ies] to sleep, regulate his emotions, be happy, and to socialize.'"); *Allen v. Discovery Commc'ns, LLC*, No. 15-CV-1817, 2016 WL 5404558, at *8 (D. Md. Sept. 28, 2016) (concluding pleadings that contained allegations of major depressive disorder and a doctor's recommendation against working would suffice to allege substantial limitation of the major life activity of working). These allegations are sufficient to demonstrate that Plaintiff is "disabled" within the meaning of the statute. *See Grullon v. Admin. for Children's Servs.*, No. 18-CV-3129, 2021 WL 981848, at *13 (S.D.N.Y. Mar. 16, 2021) (concluding the complaint alleged disability within the meaning of the ADA based on

"depression and bipolar disorder" where the complaint could be "read to allege" that the disorders "limit[ed] his ability to care for his child"); *O'Hara*, 2020 WL 1244474, at *12 (allegations that the plaintiff experienced pain and difficulty sleeping, which persisted after she left work, and repeatedly took medical leave, sufficed to demonstrate that the plaintiff was disabled under the ADA); *Robles v. Medisys Health Network, Inc.*, No. 19-CV-6651, 2020 WL 3403191, at *7 (E.D.N.Y. June 19, 2020) (concluding that where the plaintiff had alleged he had another mental health disorder identified in the implementing regulations, the court would rely on those allegations as well as examples of past mental health episodes to determine the plaintiff had alleged a disability including a substantial limitation on major life activities); *accord Rock v. E. Gas Transmission & Storage, Inc.*, No. 25-CV-6, 2025 WL 1812899, at *5 (E.D. Va. July 1, 2025) ("Here, [the plaintiff] alleges that his Major Depressive Disorder is a condition that affects his ability to sleep, concentrate, think, communicate if left untreated.  As such, [the plaintiff] plausibly alleges that he has a disability under the ADA . . . ." (citation and quotation marks omitted, alteration adopted)); *Smith v. NaphCare Inc.*, No. 22-CV-5069, 2023 WL 2477892, at *14 (W.D. Wash. Mar. 13, 2023) (explaining that the plaintiff's allegations that she suffered from multiple mental health conditions, including major depressive disorder, which impacted, among other things, her ability to "work[]" and to "sleep[,]" where the complaint included facts "showing the extent of [the plaintiff's] mental health issues," satisfied the pleading standard); *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 447–48 (5th Cir. 2018) (summary order) (concluding, at summary judgment, that the plaintiff's affidavit detailing her diagnoses, treatments, and symptoms of, *inter alia*, "depression," which affected her ability to "sleep normally," was sufficient to create an issue of material fact as to her being disabled under the ADA, particularly in light of the fact that the plaintiff declared she had "major depressive

36

disorder" a condition "included in the implementing regulations' list of impairments that should 'easily be concluded' to substantially limit brain function").

Accordingly, Defendants' reliance on cases where a disability is premised solely on allegations that a plaintiff's ability to *work* is impaired are unpersuasive. *See Woolf*, 949 F.3d at 93–95 (affirming summary judgment against a plaintiff who alleged disability based solely on impaired ability to work premised on migraines that were exacerbated by job-related stress, because the plaintiff had not demonstrated more than that he had been prevented from performing a single, particular job); *Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 164 (E.D.N.Y. 2020) (dismissing ADA disability discrimination claim on the basis that the plaintiff failed to state "any allegation indicating what, if any activity is substantially limited by [the p]laintiff's vertigo," and where allegations that the plaintiff's anxiety and depression did not reflect that these conditions "limited his ability to work generally," but only that they "prevented him from working with" two particular individuals); *accord Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000) (rejecting ADA claim due to failure to allege disability where allegations supported the conclusion that the plaintiff could perform the same job for another supervisor). Plaintiff has alleged more than an impact on her ability to work, and more than an impact on her ability to work for a specific supervisor (i.e., Defendant Sapp).

### 4. Causation

Defendants argue that Plaintiff has not alleged that she was discriminated against "because of" her gender, discriminated against because of her disability, or subjected to a hostile work environment because of her gender or disability, as required by the ADA and Title VII.

(Defs.' Mem. 20–22.)[8]  To state an affirmative employment discrimination claim under Title VII, or a hostile work environment claim under either the ADA or Title VII, a plaintiff must demonstrate a causal connection between her protected characteristic and the discrimination or hostile work environment.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) ("[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision."); *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) ("It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic.").  However, as described below, this burden is less rigorous at the Motion to Dismiss stage and varies depending on the type of claim asserted.  *See, e.g.*, *Drew v. Plaza Constr. Corp.*, 688 F. Supp. 2d 270, 275 (S.D.N.Y. 2010) ("[A]t the pleading stage . . . plaintiffs need not plead a prima facie case of discrimination[.]" (quotation marks and citation omitted)).  Unfortunately, Defendants advance their argument as to causation without meaningfully differentiating between Plaintiff's different claims.  (*See* Defs.' Mem.)  In the name of analytical clarity, the Court proceeds to consider each of Plaintiff's federal claims in turn, except Plaintiff's hostile work environment claim under the ADA, which, as explained further below, is not viable.

a. Direct Discrimination under Title VII

To state the causation element of a direct discrimination claim under Title VII, a plaintiff must plausibly allege membership in a protected class and "that the circumstances support an inference of discrimination on the basis of his membership in a protected class."  *Williams v.*

---

[8] Defendants do not challenge causation as to Plaintiff's retaliation claims.  (*See* Defs.' Mem. 20–22.)

*N.Y.C. Transit Auth.*, No. 10-CV-882, 2014 WL 11474810, at \*2 (E.D.N.Y. Sept. 16, 2014) (citation and italics omitted), *aff'd*, 620 F. App'x 63 (2d Cir. 2015); *see also Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (setting out elements of claim).[9]  At this stage, the plaintiff need not allege "specific facts establishing a prima facie case of discrimination."  *Drew*, 688 F. Supp. 2d at 275 (citation omitted); *Gonzalez v. Carestream Health, Inc.*, 520 Fed. App'x 8, 9–10 (2d Cir. 2013) (summary order) ("To survive a motion to dismiss, a complaint alleging workplace discrimination . . . need not allege specific facts establishing a prima facie case under *McDonnell Douglas* . . . .").  "Rather, an employment discrimination complaint 'must include only a short and plain statement of the claim . . . that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Drew*, 688 F. Supp. 2d at 275 (alterations adopted) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

A plausible inference of discrimination can arise from circumstances that include, "invidious comments about others in the employee's protected group[,] more favorable treatment of employees not in the protected group[,] or the sequence of events leading to" the alleged adverse action.  *Littlejohn*, 795 F.3d at 312.  Thus, to survive a motion to dismiss, a plaintiff need "not plead a prima facie case of discrimination," *Swierkiewicz*, 534 U.S. at 515, but "must plead enough facts to state a discrimination claim that is plausible on its face," *Roman-Malone v. City of New York*, No. 11-CV-8560, 2013 WL 3835117, at \*4 (S.D.N.Y. July 25, 2013) (citation omitted).  Courts making the plausibility determination "must be mindful of the elusive nature of

---

[9] Defendants do not contest that Plaintiff has demonstrated membership in a protected class as to her gender.  (*See generally* Defs.' Mem.)  Nor do they challenge her allegations as to the other elements of a direct discrimination claim pursuant to Title VII—that she was qualified for the position in question and that Defendants took an adverse employment action against her. (*See generally* Defs.' Mem.)  *Williams*, 2014 WL 11474810, at \*2 (stating elements of a direct discrimination claim).

intentional discrimination," and the concomitant frequency by which plaintiffs must "rely on bits and pieces of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination." *Vega*, 801 F.3d at 86 (citation, italics, and some quotation marks omitted).

As relevant to causation and in support of her Title VII claim, Plaintiff has alleged that there was a pay disparity between men and women, where she was compensated less than unspecified male colleagues, (FAC ¶ 33), that certain of the Defendants would scream at or ridicule female employees (including Plaintiff) but did not do the same to unspecified "similarly situated male employees," (*id.* ¶¶ 38, 42, 45, 59–60, 73, 75, 82, 95), and, she says, there was a history of Defendant Bostic "directly approaching male employees . . . disclosing the details of the complaints [made by female employees] and the identities of the reporters," and failing to "launch[] any sort of investigation," (*id.* ¶ 78).  These allegations are insufficient to support an inference of causation.

To start, Plaintiff's allegations about pay disparities and harsh treatment by supervisors appear to be an attempt to raise an inference of discrimination by showing that Plaintiff's employer "treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  While it is possible to support an inference of discrimination under these circumstances, the plaintiff must plead details sufficient to show that the similarly situated employee is an adequate comparator; allegations that she and the "comparators worked in the same group and were accountable to the same supervisors, but were subjected to disparate treatment," for instance, "may be sufficient to raise an inference of discrimination." *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495 (E.D.N.Y. 2016).  At a minimum, this requires that plaintiff identify "at least one comparator" and not a "generic class" of similarly situated employees who do not share her protected status.

*Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 99-100 (S.D.N.Y. 2023) (collecting cases); *see also Goodine v. Suffolk Cty. Water Auth.*, No. 14-CV-4514, 2017 WL 1232504, at *4 (E.D.N.Y. Mar. 31, 2017) (same); *Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *4–5 (S.D.N.Y. Mar. 29, 2016) (finding no inference of discrimination where plaintiff "fail[ed] to plead any facts regarding how the[ ] employees' identities, experience levels, and conduct compared to [the p]laintiff's"). Without sufficient allegations to support the conclusion that the comparators were, in fact, similarly situated, or allegations as to how Plaintiff's treatment differed from similarly situated comparators, and without the identification of even a single comparator, Plaintiff cannot rely on this theory to raise an inference of discrimination. *See Paupaw-Myrie*, 653 F. Supp. 3d at 100–01 (dismissing claim pursuant to Rule 12(b)(6) where the "[p]laintiff fail[ed] to provide facts as to which colleagues acted comparably but were not passed over for [advancement], to whom those employees reported, what their responsibilities were, and how their disciplinary histories compared to hers"); *Richardson v. City of New York*, No. 17-CV-9447, 2018 WL 4682224, at *9 (S.D.N.Y. Sept. 28, 2018) ("[T]he complaint never describes the comparative qualifications of Riojas and Thomas and those employees who have received discretionary raises."); *Goodine*, 2017 WL 1232504, at *4 ("[A] Title VII plaintiff must still identify at least one comparator to support a minimal inference of discrimination; otherwise the motion to dismiss stage would be too easy to bypass[.]"); *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) ("Without factual amplification, the generic allegation of disparate treatment related to an unspecified class of [c]aucasian persons is simply not sufficient to 'nudge . . . claims across the line from conceivable to plausible,' and thus is insufficient to support [a] racial discrimination claim.").

However, generic class-based allegations are not the sole basis upon which Plaintiff may prove causation. Specifically, Plaintiff has alleged that Defendant Bostic, who worked in Human Resources, had a history of "directly approaching male employees . . . disclosing the details of the complaints [made by female employees] and the identifies of the reporters," and failing to "launch[] any sort of investigation," and that he did, in fact, directly approach Defendant Sapp about her complaint and fail adequately to investigate it. (FAC ¶¶ 78–79.) The Second Circuit has instructed that the "failure of an employer to conduct an adequate investigation or to undertake an appropriate response [when faced with allegations of harassment] can constitute evidence in support of a Title VII plaintiff's allegations," and specifically can support the existence of causation. *Sassaman v. Gamache*, 566 F.3d 307, 314–15 (2d Cir. 2009). Still, "an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action," the Second Circuit has suggested, is usually not enough "standing alone . . . to support an inference of discriminatory intent." *Id.* at 315.

Here, even the practice of allegedly-insufficient investigations is not sufficient to support an inference of discriminatory intent. In *Sassaman*, for instance, the plaintiff relied *not only* on an allegedly inadequate investigation into his complaint, but also on deposition testimony that the individual who informed him "he would be terminated unless he chose to resign" said that he "probably did what [his supervisor] said you did because [he was] male and nobody would believe [him] anyway." *Id.* at 311. In other words, "*Sassaman* is distinguishable because of both the nature of the gender discrimination claim asserted and the quantity and quality of facts included in [P]laintiff's complaint." *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp. 2d 206, 217 (E.D. Pa. 2010). Plaintiff has not alleged that Defendants made any express reference to her sex, nor has she otherwise provided any direct or circumstantial evidence that

42

the unfairness of the investigation was gender-based.  *See Ali-Hasan v. St. Peter's Health Partners Med. Assocs., P.C.*, No. 22-2669, 2023 WL 7320860, at *2 (2d Cir. Nov. 7, 2023) (summary order) (affirming grant of summary judgment to the defendants where the plaintiff "ha[d] not provided *any . . .* evidence" closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision); *Hooker v. Hilton Hotels Corp.*, No. 10-CV-3019, 2012 WL 2798768, at *15 (D. Md. July 6, 2012) (reasoning that the plaintiff could not demonstrate an allegedly-insufficient investigation would support an inference of intent without direct or circumstantial evidence that the unfairness was gender-based or based on a sex stereotype).

Simply put, where "Plaintiff has not provided factual allegations that would permit a reasonable inference that her treatment and termination were connected to her sex"—such as "conduct by any other individual that was premised on her sex, referenced her sex, or was specific to her because of her sex,"—nor plausibly "allege[d] that a similarly situated employee of a different sex was treated better than her" or "that upon being terminated, she was replaced by a person of a different sex" but simply "pleads extensive and detailed facts about how she was treated poorly at work," she has not stated a sex discrimination claim.  *Downing v. Yadav*, No. 24-CV-04739, 2026 WL 734180, at *7 (E.D.N.Y. Mar. 16, 2026).  "Because [P]laintiff's [A]mended [C]omplaint merely raises conclusory assertions of discrimination on the basis of sex, but fails to offer facts that would give rise to an inference of discriminatory motivation, plaintiff has failed to state a claim for sex discrimination under Title VII. Accordingly, the claim must be dismissed."  *Id.* (citing *Iwelu v. N.Y. State Off. of Mental Health*, No. 22-CV-03096, 2024 WL 2175938, at *3 (2d Cir. May 15, 2024) (summary order)); *see also Williams v. Westchester Med. Ctr. Health Network*, No. 21-CV-3746, 2024 WL 990153, at *9

(S.D.N.Y. Mar. 7, 2024) (concluding that the plaintiff "fail[ed] to allege that" the alleged adverse employment action "occurred on the basis of race or gender discrimination, thus dooming [his Title VII discrimination" claim); *Murillo-Roman v. Pension Boards - United Church of Christ*, No. 22-CV-08365, 2024 WL 246018, at *10 (S.D.N.Y. Jan. 23, 2024) (concluding the plaintiff had adequately alleged discriminatory intent where she claimed increased workload, deprivation of information and steps needed to complete assignments, and "her direct supervisor[] issu[ing] a steady stream of comments mocking [her] accent" alongside complaints about discriminatory treatment based on accent and skin color that went "largely unaddressed"); *Mitchell v. New York City Dept. of Ed.*, No. 20-CV-1555, 2022 WL 621956, at *5–6 (S.D.N.Y. Mar. 3, 2022) (dismissing complaint that included merely "descri[ptions of] adverse employment actions that [the plaintiff] experienced, without linking those adverse employment actions in any way to [the plaintiff's] age, race, or gender" and reporting the plaintiff's belief that these actions were based on his age, race, and gender); *Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433, 444 (W.D.N.Y. 2021) (dismissing complaint that included allegations that the plaintiff was "treated differently than co-workers outside of her protected group," including where she was not selected for certain workplace opportunities and was "subjected to verbal harassment and intimidation by a [c]aucasian male co-worker . . . and the alleged harasser was not reprimanded," and where a "[c]aucasian" coworker was "promoted . . . despite having less experience with the practice than" a Black physician, on the basis that she had "completely failed to allege that she was situated *similarly in all material respects* to the individuals whom she seeks to compare

44

herself with," i.e., "[h]er situation was unique" and "not similar to others" (alterations adopted) (quotation marks omitted)).[10]

### b. Hostile Work Environment under Title VII

To state a hostile work environment claim based on sex discrimination under Title VII, a plaintiff must allege facts sufficient to support that  (1) the alleged conduct is "objectively severe or pervasive" such that it "creates an environment that a reasonable person would find hostile or abusive"; (2) the plaintiff "subjectively perceives" the environment as "hostile and abusive"; and (3) such an environment is created because of the plaintiff's sex. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  As described above, Defendants challenge only whether Plaintiff has alleged facts sufficient to support causation as to her hostile work environment claim.  The Court concludes Plaintiff has done so.

Plaintiff has alleged the following facts in support of her hostile work environment claim: Defendants Sapp and Mallen would regularly belittle and berate female employees, and Sapp did so berate and belittle Plaintiff on multiple occasions, (FAC ¶¶ 37–40, 59, 73–75, 82); Sapp would regularly shut Plaintiff out in the workplace, including closing his door at almost all times, rolling his eyes at, glaring at, and refusing to make eye contact with her, (*id.* ¶¶ 68–70), and excluding Plaintiff "from important emails, meetings, and conversations critical to her role," (*id.* ¶ 70); Sapp made false performance-related accusations against Plaintiff, (*id.* ¶¶ 91–92); and

---

[10] The cases cited by Plaintiff do not compel the contrary conclusion.  *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085-CV, 2025 WL 704278, at *1 (2d Cir. Mar. 5, 2025) (summary order), does not involve claims under Title VII but the FMLA, NYSHRL, and NYCHRL. Moreover, that decision did not squarely address whether the plaintiff "met the minimal burden required to establish his prima facie case for discrimination on the basis of a protected characteristic." *Id.* at *3.  So too for *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597 (2d Cir. 2006), which did not involve a direct discrimination claim under Title VII.

once entered a fit of rage directed at Plaintiff, which included throwing objects at her, (*id.* ¶¶ 7, 94–95); and Defendant Bostic reported complaints by female employees to the male employees who were the subject of those complaints, (*id.* ¶ 78).

In the context of a hostile work environment claim, to determine causation a court may look to "[f]acially neutral incidents" as part of the totality of the circumstances, "so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). Such a conclusion may be based upon "circumstantial or other" allegations that permit an inference "that incidents sex-neutral on their face were in fact discriminatory." *Id.* Among other things, such an inference can be supported where the "same individual" engages in "multiple acts of harassment." *Id. See also Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 229 (2d Cir. 2024) (explaining that, in the hostile workplace environment, sex-based discrimination claims may be supported by facially neutral incidents and a plaintiff need not herself been the target of the other instances of hostility). Here, Plaintiff has alleged in her Amended Complaint "enough facts—for example, facts illustrating the pervasiveness of" the differential treatment of male and female employees and facts demonstrating a failure to act on (and indeed, efforts to undermine) Human Resources complaints made by women about men "at her workplace—to show that the hostility and abusiveness she experienced was in part motivated by her gender." *Riggs v. Akamai Techs.*, No. 23-CV-6463, 2024 WL 3347032, at *4 (S.D.N.Y. July 8, 2024). The Court will assume, without deciding, that, on a motion to dismiss, this is enough to satisfy causation. *See Vega*, 801 F.3d at 85 (explaining that to sustain a claim under Title VII, a plaintiff must provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent"); *Alfano*, 294 F.3d at 377 ("In a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to

46

allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent.  The plaintiff must, however, establish at trial that incidents apparently sex-neutral were in fact motivated by bias."); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) ("Because the record indicates that [the plaintiff] and other African American employees were the target of 'frequent and highly repugnant insults,' we conclude that a reasonable jury could find that the use of racial epithets and other racially motivated conduct was sufficiently pervasive—even if not independently severe—to support a hostile work environment claim.").  Specifically, Plaintiff's claims that the verbal tirade she experienced was part of a regular practice of belittling and berating female employees, (FAC ¶¶ 37–40, 59, 73–75, 82), and her claim that Defendant Bostic reported complaints by multiple female employees to the male employees who were the subject of those complaints, (*id.* ¶ 78), may be sufficiently sex-based to support the causal element that is missing from her direct discrimination claim, at least on a motion to dismiss, as repeated acts of harassment carried out by the same individual that, the Second Circuit has held, can support causation in the context of a hostile work environment claim.  *See Alfano*, 294 F.3d at 375.

### c. Disability Discrimination under the ADA

To make out a prima facie case for discrimination under the ADA, a plaintiff must establish that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." *Falso v. SPG Direct*, 353 F. App'x 662, 663 (2d Cir. 2009).

In her Amended Complaint, Plaintiff does not allege that she suffered any adverse

employment action because of her disabilities.  Indeed, she does not allege any link between *any* adverse action and her disability.  As to her disability, Plaintiff alleges: she requested an accommodation, (FAC ¶ 159), Defendant Perri, upon receipt of that request, asked her dismissively, "What kind of disability i[s] that?" (*id.* ¶ 160), she presented documentation recommending a specific accommodation, (*id.* ¶¶ 161–62), and Defendant Amalgamated denied her requested accommodation without undertaking an interactive process, (*id.* ¶¶ 163–64).  She also suggests that "many non-disabled employees had already received" the accommodation she requested, which was "an additional day of work-at-home" each week.  (*Id.* ¶ 162.)  To the extent that Plaintiff has alleged facts to support the conclusion that any activity by Defendants was related to her disability, she has alleged that Amalgamated and/or Perri denied her request for an accommodation because her disability was not taken seriously.  While the failure to accommodate Plaintiff's disability is an unfortunate and, apparently, an unnecessary choice by Defendants, "the Second Circuit has made clear that the denial of an accommodation is not itself an adverse employment action providing a basis for a claim for discrimination." *Shields*, 489 F. Supp. 3d at 164 n.4; *see also Rosich v. La Salle Acad.*, No. 24-CV-09183, 2025 WL 2410596, at *8 (S.D.N.Y. Aug. 20, 2025) ("Courts in this Circuit have held that failing to accommodate an employee is, by itself, not sufficient for establishing an adverse employment action, since the failure to accommodate must result in some other adverse employment action that materially alters the employee's working conditions." (quotation marks omitted and alterations adopted)); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019) (determining that denial of the plaintiff's request for an accommodation (permission to take breaks to go home and take his medicine), even if related to his disability, did not constitute a material adverse employment action).  Accordingly, Plaintiff has not alleged that she underwent any adverse employment

action *because of* her disability.  In these circumstances, Plaintiff's claim must be dismissed. *See, e.g.*, *Jordan v. Greater Buffalo United Accountable Healthcare Network*, No. 12-CV-67, 2021 WL 2419564, at *4 (W.D.N.Y. Apr. 20, 2021) ("Plaintiff fails to state a claim for discrimination under the ADA because she has not alleged . . . that she suffered an adverse action because of any alleged disability."), *report and recommendation adopted sub nom. Jordan v. Greater Buffalo United Accounted Healthcare Network*, 2021 WL 2416838 (W.D.N.Y. June 14, 2021).

    5.  Hostile Work Environment

In addition to the causation challenge described above, Defendants also move to dismiss Plaintiff's Hostile Work Environment claims for failure to allege a hostile work environment. The Court concludes that Plaintiff's Amended Complaint does not allege facts sufficient to support the existence of a hostile work environment in violation of Title VII or the ADA.

Title VII and the ADA both prohibit employers from subjecting employees to a hostile work environment based on their protected status.  *See Fox*, 918 F.3d at 74 ("We are persuaded by our sister Circuits, which have reasoned that claims for hostile work environment are actionable under the ADA."); *Littlejohn*, 795 F.3d at 320 (explaining that "[t]he phrase terms, conditions, or privileges of employment [in Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment, which includes requiring people to work in a discriminatorily hostile or abusive environment" (alteration omitted) (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012))).  "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff

subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'" *Patane*, 508 F.3d at 113; *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("Moreover, '[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79–80 (1998))); *Castagna v. Luceno*, No. 09-CV-9332, 2011 WL 1584593, at *6 (S.D.N.Y. Apr. 26, 2011) (same). In the context of a hostile work environment claim "a plaintiff who herself experiences discriminatory harassment *need not be the target of other instances of hostility in order for those incidents to support her claim*." *Moll*, 94 F.4th at 229 (2d Cir. 2024) (emphasis in original) (wholly quoting *Kaytor*, 609 F.3d at 547).

To support the requisite severity at the motion-to-dismiss stage, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane*, 508 F.3d, at 113 (alterations omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see also Gonzalez v. City of New York*, No. 15-CV-3158, 2015 WL 9450599, at *4 (E.D.N.Y. Dec. 22, 2015) (same). "[A] work environment's hostility should be assessed based on the totality of the circumstances." *Patane*, 508 F.3d at 113 (citation and quotation marks omitted); *see also Humphries v. City Univ. of N.Y.*, No. 13-CV-2641, 2013 WL 6196561, at *10 (S.D.N.Y. Nov. 26, 2013) (same). Relevant circumstances include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Humphries*, 2013 WL 6196561, at *10 (citing *Gorzynski v.*

50

*JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (same).  The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009).  "Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (citation and quotation marks omitted).  "[W]hether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry," and accordingly, the Second Circuit has "repeatedly cautioned against setting the bar too high" in the context of a motion to dismiss. *Patane*, 508 F.3d at 113–14 (citation and quotation marks omitted); *see also Humphries*, 2013 WL 6196561, at *10 (same).

The incidents of harassment, generally, "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano*, 294 F.3d at 374).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Keaton v. Conn. Dep't of Rehab. Servs.*, No. 16-CV-1810, 2018 WL 1245728, at *10 (D. Conn. Mar. 9, 2018) (quoting *Alfano*, 294 F.3d at 374).  However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374; *see also Camarda v. City of New York*, No. 11-CV-2629, 2015 WL 5458000, at *7 (E.D.N.Y. Sept. 16, 2015) (same), *aff'd*, 673 F. App'x 26 (2d Cir. 2016).

Defendants assert that the alleged conduct based upon Plaintiff's gender does not "rise to the required severity to state a claim." (Defs.' Mem. 22.)  The Court agrees.  The facts alleged are insufficiently severe to constitute a hostile work environment based on Plaintiff's sex.  Faced

51

with similar allegations, the court in *Johnson v. City of New York*—a case cited by Plaintiff—

reached the same conclusion. *See Johnson v. City of New York*, No. 23-CV-5378, 2024 WL

3520474 (S.D.N.Y. July 24, 2024). In *Johnson*, the plaintiff alleged that he had an altercation

with a female coworker, who became "irate and aggressive, and began to shout discriminatory

and offensive comments" directed at the plaintiff, who was a Black man. *Id.* at *1. This

included the coworker using the n-word and calling the plaintiff a "pussy"; when the plaintiff

reported the behavior, his supervisor, who was a woman, "berated him in front of other officers"

and made fun of the harassment he experienced from his coworker. *Id.* A few days later,

another female supervisor "became irate" at the plaintiff and yelled at him, threatening to

fabricate misbehavior allegations against him. *Id.* The plaintiff provided a detailed account of

further mistreatment, including false workplace misconduct charges and repeated incidents of

harassment by the plaintiff's same supervisor. *Id.* at *2. Like this case, *Johnson* involved

allegations of harassment—much more specific and detailed than those made here—that

included "irate" behavior and verbal tirades by multiple supervisors who did not share the

plaintiff's protected status. *See id.* at *1–2. Nevertheless, the court in *Johnson* concluded that

these allegations were "not 'sufficiently continuous and concerted in order to be deemed

pervasive.'" *Id.* at *5 (quoting *Littlejohn*, 795 F.3d at 321). So too here. In fact, courts faced

with significantly more severe allegations have held that they are not enough to meet the severity

threshold. *See Schulman v. Dep't of Educ. of City of New York*, No. 24-CV-8322, 2026 WL

573298, at *1, 5 (S.D.N.Y. Mar. 2, 2026) (holding that allegations that a principal employed by

the defendant sent the plaintiff approximately ten text messages that included "inappropriate

sexual images, such as genitalia," then cut funding for the teacher-plaintiff's class, excluded the

plaintiff from opportunities on at least seven occasions, imposed a heavier workload on the

52

plaintiff, and made false disciplinary allegations against the plaintiff, was insufficiently severe or pervasive to state a hostile work environment claim); *Byas v. Yonkers Pub. Schs.*, No. 23-CV-8437, 2025 WL 963977, at *8 (S.D.N.Y. Mar. 31, 2025) (holding that the assignment of undesirable tasks, exclusion from training and other opportunities and resources, racial slurs by students, taken together, "fail to establish the kind of severity and pervasiveness that can amount to an actionable hostile work environment claim"); *Ben-Levy v. Bloomberg L.P.*, No. 11-CV-1554, 2012 WL 2477685, at *12 (S.D.N.Y. June 26, 2012) (explaining a hostile work environment claim "is a wholly separate cause of action [from discrete claims of discrimination and retaliation] designed to address other types of work place behavior, like constant jokes and ridicule or physical intimidation" (emphasis and quotation marks omitted)).[11]

It is true that, if severe enough, an "obscene and humiliating verbal tirade that undermines the victim's authority in the workplace" can satisfy the severity requirement on its own with no further allegations. *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008). But Plaintiff has alleged nothing about the contents of the "tirades" she or her female colleagues were subjected to, and there is no basis for the Court to conclude that they would meet this

---

[11] The other cases cited by Plaintiff likewise involve much more severe mistreatment than that alleged in the Amended Complaint. *See Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (vacating dismissal of hostile work environment claim where, among other things, the plaintiff's superior made demeaning comments, many of which were sexual, as well as unwelcome physical contact of a sexual nature, and explained "in graphic detail how a rape may occur," and described other explicit acts in detail and, when the plaintiff complained to her immediate supervisor, she was told to "get on board or quit" and new restrictions were put on her work activities); *Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 339–40 (E.D.N.Y. 2012) (holding that the plaintiff stated a claim where she alleged that her direct supervisor "leered at her for unreasonable amounts of time," "continuously commented on her buttocks" to her and to other co-workers, "constantly made inappropriate sexual comments about women" around the plaintiff, once grabbed her buttocks and pressed his body against her, and made specific, detailed sexual comments about the plaintiff's buttocks to her).

requisite severity.  (*See* FAC ¶¶ 37–40, 59, 73–75, 82.)  *See Johnson*, 2024 WL 3520474, at *5 (concluding severity had not been alleged, despite allegations including multiple tirades and use of a racial epithet).  The allegation that Sapp threw certain unspecified objects at Plaintiff is likewise insufficient: "limited incidents of physical violence without a sexual element" rarely suffice to establish a hostile work environment.  *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-CV-10923, 2022 WL 845770, at *11 (S.D.N.Y. Mar. 22, 2022); *see also id.* (concluding that allegation that plaintiff's supervisor "physically pushed him out of his office" was insufficient—even when coupled with a "spate of micro-aggressions," another supervisor's mocking the plaintiff's accent and falsely claiming not to understand him, negative review, and falsely accusing him of failing to do certain tasks—did not constitute a hostile work environment); *Reach v. Healthfirst, Inc.*, No. 23-CV-8085, 2024 WL 4493769, at *4 (S.D.N.Y. Oct. 15, 2024) (concluding allegations "that a manager made negative statements and used harsh tones, distanced themselves and was unresponsive, issued wrongful reprimands, and sought negative information on the plaintiff are insufficient to constitute a hostile work environment"); *Anderson v. City of New York*, 712 F. Supp. 3d 412, 423, 430 (S.D.N.Y. 2024) (rejecting hostile work environment claim premised on allegations that a coworker "engaged in a campaign of intimidation," "including throwing objects, slamming doors, and staring at [a plaintiff] in common spaces" on the basis that, while "[the defendant's] alleged behavior indicate[s] he is unpleasant to work with, [the p]laintiff's factual allegations fail[ed] to plausibly establish any discriminatory motive"); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x. 115, 119 (2d Cir. 2010) (summary order) (no actionable claim based on allegations of throwing objects in combination with excessive criticism, isolation, and exclusion from meetings).  Even taking these allegations together, Plaintiff has not met her burden to allege a hostile work environment.

The Court makes the same determination as to Plaintiff's claim for a hostile work environment based on her disability.  As mentioned above, the sole incident that Plaintiff alleges that is tied to her disability status that might support a hostile work environment is that Plaintiff alleges that Defendant Perri spoke dismissively about her diagnoses, and that her disability ultimately was not accommodated.  (FAC ¶ 160 ("HR Perri both diminished the seriousness of and questioned the legitimacy of Plaintiff's accommodation needs when she said, 'What kind of disability it that?' after Plaintiff disclosed and described her Generalized Anxiety Disorder and Major Depressive Disorder diagnoses.  HR Perri asked this question in a condescending tone, making it clear that she did not take Plaintiff's diagnoses seriously nor believe they merited accommodation.").)  This type of one-off, stray remark, not made by a decisionmaker and not in conjunction with Plaintiff's being fired or any other adverse employment action, is insufficient to allege a hostile work environment based on Plaintiff's disability.  *Harris v. Off. of New York State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *9 n.14 (S.D.N.Y. Mar. 17, 2022) ("[A] stray remark, such as this one, is insufficient to support a claim for hostile work environment." (quotation marks omitted)); *Trujillo v. City of New York*, No. 14-CV-8501, 2016 WL 10703308, at *15 (S.D.N.Y. Mar. 29, 2016) ("[S]tray remarks, standing alone, are insufficient to make out a hostile work environment claim."), *aff'd*, 696 F. App'x 560 (2d Cir. 2017); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (citing approvingly the "standardized approach" of "[t]he district courts in this circuit" in "determining whether a remark is probative, [which] . . . consider[s] four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a

55

reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)").

### III.  Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss is denied in part and granted in part.  Specifically, Plaintiff's first cause of action for Gender Discrimination in Violation of Title VII is dismissed, (FAC ¶¶ 180–85), Plaintiff's second cause of action for Gender-Based Hostile Work Environment in Violation of Title VII is dismissed, (*id.* ¶¶ 186–92), Plaintiff's fourth cause of action for Disability Discrimination and Failure to Engage in an Interactive Process in Violation of the ADA, (*id.* ¶¶ 204–14), is dismissed to the extent Plaintiff is attempting to raise an ADA discrimination claim, but not insofar as Plaintiff might be seeking to raise a failure to accommodate claim; Plaintiff's fifth cause of action for Hostile Work Environment in Violation of the ADA is dismissed, (*id.* ¶¶ 215–21).  Plaintiff's seventh cause of action for Gender Discrimination, Disability Discrimination, and Hostile Work Environment in Violation of NYSHRL § 296(1), (FAC ¶¶ 228–33), is dismissed against the individual Defendants, as described above.  Plaintiff's tenth cause of action for Aiding and Abetting Discrimination and Retaliation in Violation of NYSHRL § 296(6), (FAC ¶¶ 252–59), is dismissed against Defendants Mallen, Burston, and Perri as described above.

By contrast, Plaintiff's eighth cause of action for Failure to Engage in an Interactive Process in Violation of the NYSHRL, (*id.* ¶¶ 234–41), and ninth cause of action for Retaliation in Violation of the NYSHRL, (*id.* ¶¶ 242–51), are not dismissed for the reasons described above. As mentioned, Plaintiff's fourth cause of action is not dismissed to the extent she has raised a failure to accommodate claim.

Defendants did not challenge Plaintiff's third cause of action for retaliation in violation of Title VII, (*id.* ¶¶ 193–203; Def.'s Mem. 24), nor her sixth cause of action for retaliation in violation of the ADA, (FAC ¶¶ 222–27), and so these claims survive.

In light of the fact that this is the first time Defendants have moved to dismiss Plaintiff's claims on the merits, the dismissal is without prejudice. *Calchi v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, No. 22-CV-1341, 2023 WL 2447399, at *2 (S.D.N.Y. Mar. 10, 2023) ("Because this is the first adjudication of his claims on the merits, Plaintiff's claims are dismissed without prejudice."). If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies the Court has identified, Plaintiff must do so within 30 days of the date of this Order. The amended complaint will replace, not supplement, the previous complaints. *See id.* The failure to timely file an amended complaint may result in the dismissal of this Action with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 27.

SO ORDERED.

Dated:    March 30, 2026
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge